**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | |
|---|---|
| FIRETREE, LTD.,<br>　　　Plaintiff,<br><br>　　　v.<br><br>NORWALK et al.<br>　　　Defendants. | No. 3:17cv1088 (MPS) |

**RULING ON MOTION TO DISMISS**

I.     **Introduction**

Plaintiff Firetree, Ltd. ("Firetree") brings this suit against defendants[1] for denying it various permits required for it to operate a halfway house in Norwalk, Connecticut. Firetree alleges that the defendants' actions were motivated by discriminatory animus against the future residents of the halfway house, whom Firetree alleges are disabled. Firetree sets out the following claims based upon these allegations: (i) violation of the Fair Housing Act, 42 U.S.C. § *et seq.* ("FHA") (count one); (ii) violation of the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.* (count two); (iii) violation of the Rehabilitation Act, 29 U.S.C. § 794 *et seq.* (count three); (iv) violation of Firetree's right to substantive due process and procedural due process (count four); (v) violation of Firetree's rights to equal protection and against retaliation (count five); (vi) violation of the Connecticut Fair Housing Act, Conn. Gen. Stat. § 46a-64 *et seq.* ("CFHA") (count six); (vii) mandamus under Conn. Gen. Stat. § 52-485 *et seq.* (against defendants Ireland, Rochefort, and Wrinn) (count seven); (viii) an appeal of the City of Norwalk

---

[1] The defendants include the City of Norwalk Zoning Board of Appeals, the City of Norwalk, and the following individuals, all of whom are sued in their official capacities: Aline Rochefort, Harry Rilling; Michael Wrinn;  Andrew Conroy; Lee Levey; Gregory Brasher; Taylor Strubinger; Keith Lyon; and Nadine Campbell.

Zoning Board of Appeals' ("ZBA") denial of a certificate of occupancy under Conn. Gen. Stat. § 8-8 (count eight); (ix) an appeal of the ZBA's denial of the plaintiff's special exception application (count nine); (x) violation of the Equal Protection Clause of Article I, § 5 of the Connecticut Constitution (count 10); and (xi) a regulatory taking in violation of Article First, § 11 of the Connecticut Constitution (count 11). Now before me is the defendants' [48] motion to dismiss Firetree's complaint under Fed. R. Civ. P. 12(b)(1) and Fed. R. Civ. P. 12(b)(6). For the reasons that follow, the motion is denied.

## II. Factual Allegations

Plaintiff makes the following factual allegations, which I assume to be true.

### A. Firetree's Planned Halfway House

Firetree "operates halfway houses in Pennsylvania and New York for individuals referred by the Federal Bureau of Prisons ("BOP") . . . pursuant to fee for service contracts with the BOP." (ECF No. 26, Amended Complaint ("Complaint") at ¶ 16.) These "halfway houses provide quality transitional services to individuals associated with the criminal justice system, including many who are recovering from alcohol addiction or drug addiction, have mental health disabilities, or have physical disabilities." (*Id.* at ¶ 17.) The "vast majority of individuals who reside at Firetree's halfway houses are diagnosed by the BOP as disabled with either addiction recovery disabilities, mental health disabilities, or physical disabilities." (*Id.* at ¶ 22.) Firetree "expects that at least 75% of the residents at its Norwalk facility will have mental health or physical disabilities, or will be recovering from drug or alcohol dependency." (*Id.* at ¶ 31.) Individuals "identified by the BOP for placement in a reentry facility [run by Firetree] may decline such a referral." (*Id.* at ¶ 24.) The individuals who choose to reside in Firetree's halfway houses "must try to obtain employment" and, once employed, must pay a quarter of their pay to

"the BOP to partially cover the cost of housing the residents at Firetree's halfway houses." (*Id.* at ¶ 27.) Residents "may leave the facility with the permission of Firetree staff." (*Id.* at ¶ 28.)

### B. Previous Use of the Property

The property that Firetree sought to use for its planned halfway house ("the Property") is located in the City of Norwalk's "C Residence Zone" district. (*Id.* at ¶ 35.) Before Firetree acquired the property, it was owned by Pivot Ministries. (*Id.* at ¶ 36.) Pivot Ministries "obtained zoning permits to use the Property as a halfway house." (*Id.*) The zoning permits in question "variously identified the use as 'drug rehab center (L-2 Rooming House),' 'drug rehabilitation center,' and 'rehabilitation center.'" (*Id.*). The permits "did not limit the number of individuals who could reside at the Property, and did not place any conditions on the use of the Property." (*Id.*) "Most of Pivot Ministries' residents resided at the Property as an alternative to being incarcerated, had been recently released from prison, or had regular contact with the criminal justice system, including probation, parole, or supervised release." (*Id.* at ¶ 37.) Pivot Ministries used the Property in this manner through 2015. (*Id.*)

During this period, Pivot Ministries' use of the Property as a halfway house "became legally nonconforming in two ways: (1) when the [City of Norwalk ("City")] amended the Building Zone Regulations in 1979 to remove 'eleemosynary' uses as a permitted use in the C Residence Zone, and (2) when the City amended the Building Zone Regulations in 1989 to add a definition of the term 'halfway house' and to allow halfway houses in the C Residence Zone with special permit approval from the Norwalk Zoning Commission." (*Id.* at ¶ 39.) "In 2016, the City's Assistant Director of Planning and zoning found that Pivot Ministries' use of the Property was legally nonconforming." (*Id.*) "Since 1989, section 118-350 of the Building Zone Regulations" has provided that "a halfway house for persons under the jurisdiction of the

Department of Corrections shall not be permitted." (*Id.* at ¶ 41.) "Pivot Ministries never applied for or obtained a special permit relating to its use of the Property as a halfway house." (*Id.* at ¶ 42.)

### C. Firetree's Purchase of the Property and Subsequent Preparations

In early 2014, Pivot Ministries contacted Firetree "to see if Firetree would be interested in buying the Property for use as a halfway house. (*Id.* at ¶ 46.) Firetree subsequently contacted Zoning Enforcement Officer Aline Rochefort ("ZEO"), who informed the company that "[a] new zoning permit could be issued for the same use." (*Id.* at ¶ 48.) "Firetree and Pivot Ministries jointly submitted an application for zoning permit approval and zoning compliance on June 2, 2015." (*Id.* at ¶ 51.) The ZEO "hand-wrote on the application form that the use is a 'renovation to existing residence—rehab center per attached back-up documentation.'" (*Id.* at ¶ 51.) The ZEO "approved the zoning permit application on June 11, 2015 and issued a zoning permit (the 'Zoning Permit')." (*Id.* at ¶ 53.) Relying upon this, "Firetree purchased the Property from Pivot Ministries for $429,000 in July 2015" and "entered into a contract with the BOP to provide halfway house services at the Property to individuals being released from the BOP." (*Id.* at ¶¶ 54-55.) Firetree applied for and received two building permits in the spring of 2016, and proceeded to complete renovation work at the Property at a cost of approximately $630,000. (*Id.* at ¶ 59.) "Much of the renovation work undertaken by Firetree was specific to the Property's intended use and occupancy as a halfway house . . . ." (*Id.* at ¶ 60.) Firetree purchased various equipment for the Property and hired several employees to work at the Property. (*Id.* at ¶¶ 61-61.) "Firetree announced publicly that it intended to open its facility on September 1, 2016." (*Id.* at ¶ 62.)

**D.      Opposition to Firetree's Intended Use of the Property**

In July 2016, several residents near the Property created "the Quintard Avenue Neighborhood Association ("QANA") and . . . encouraged its members and residents to contact the Mayor [of Norwalk] and other elected official to oppose [Firetree's intended use of the Property]." (*Id.* at ¶ 63.) "QANA and others opposed to Firetree sought to prevent use of the Property as a halfway house because they did not want disabled individuals in their neighborhood." (*Id.* at ¶ 66.) The concentrated opposition of QANA exerted significant political pressure on Norwalk Mayor Harry Rilling, who in turn "took steps to ensure that the neighbors got what they wanted." (*Id.* at ¶¶ 64-67.)

"On or about August 17, 2016, the City's building inspectors determined that Firetree had satisfactorily completed the renovation work and recommended that a [certificate of occupancy ("C.O.")] be issued to Firetree to occupy and use the Property." (*Id.* at ¶ 68.) Firetree requested a C.O. in August of 2016. (*Id.*) "The issuance of the C.O. was a ministerial act"; "[b]ecause Firetree had satisfied all requirements for the issuance of the C.O., the City lacked any discretion to deny it." (*Id.* at ¶ 69.) In late August of 2016, however, Mayor Rilling announced at a rally near the Property that "the City's Building Zone Regulations do not permit halfway houses on Quintard Avenue," and that "the Norwalk Building Department would not issue Firetree a C.O. . . ." (*Id.* at ¶ 71.)

Bowing to this political pressure, the City denied the C.O. on the basis that "the existing zoning permit is for Pivot Ministries to operate a drug rehabilitation facility [and] the President of [Firetree] has indicated that Firetree intends to operate a new facility on the premises which may include the operation of a halfway house." (*Id.* at ¶ 75.) The City informed Firetree that it would have to "submit a new application for the new operator of your facility, which properly

sets forth any existing and proposed uses of the building." (*Id.*)  Firetree was also "told by the ZEO for the first time on October 13, 2016 that it needed an additional 'tenant occupancy permit' in order to occupy the Property, even though it had already obtained the Zoning Permit and the Building Permit and its use of the Property would be materially the same as Pivot Ministries' previous legally protected nonconforming use of the Property." (*Id.* at ¶ 78.)  Under protest, Firetree "followed the ZEO's suggestion and on January 13, 2017, filed an application for a tenant occupancy permit and certificate of zoning compliance." (*Id.* at ¶ 80.)  "On February 6, 2017, Mayor Rilling wrote to a member of QANA to say that Firetree's application for a tenant occupancy permit was going to be denied, that the matter would likely end up in court, and that the City 'will need neighborhood support.'" (*Id.* at ¶ 82.)  The ZEO denied Firetree's application for a tenant occupancy permit and zoning certificate of compliance two days later in a one paragraph letter that "failed to articulate any basis or reason" for the denial.  (*Id.* at ¶¶ 82-83.)

Despite this setback, "Firetree appealed the ZEO's February 8, 2017 decision to the ZBA . . . ." (*Id.* at ¶ 84.)  "At the same time Firetree filed the Appeal, in the alternative, it submitted an application for special exception approval to allow a change from one nonconforming use to another nonconforming use pursuant to Building Zone Regulations Section 118-800.C(4) ('Special Exception Application')." (*Id.* at ¶ 85.)  "Firetree also requested that the ZBA grant the Appeal and order that a tenant occupancy permit and certificate of zoning compliance be issued, or, in the alternative, approve the Special Exception Application, as reasonable accommodations under the [FHA], and the [ADA], even if the ZBA determined that the use was not legally nonconforming or, in the case of the Special Exception Application, did not meet the applicable

criteria." (*Id.* at ¶ 86.) Firetree made two requests for reasonable accommodations for its future residents during the proceedings of the Appeal. (*Id.* at ¶ 87.)

The ZBA held a public hearing on Firetree's appeal on May 4, 2017. (*Id.* at ¶ 91.) During the hearing, a crowd of "unruly" residents "shout[ed] profanities while Firetree presented its appeal, and repeatedly interrupted Firetree during the course of its presentation." (*Id.* at ¶ 92.) Firetree argued, amongst other things, "that the intended residents of its Norwalk halfway house were a protected class under state and federal law and that the ZBA was required to consider Firetree's requests for reasonable accommodations to permit the use of the Property as a halfway house." (*Id.* at ¶ 94.) In particular, "Firetree presented evidence that the accommodations were necessary to aid the Norwalk facility's disabled residents because living in the group residential setting at the Property [would] affirmatively enhance disabled residents' quality of life by ameliorating the effects of their disabilities." (*Id.* at ¶ 95.) Several of the residents at the hearing, however, opposed Firetree's proposed halfway house "based on the disabilities of the residents, and stereotypes about those with disabilities . . . ." (*Id.* at ¶ 101.) The meeting was continued to June 7, 2017, during which time two members of the ZBA expressed biases against Firetree's proposed usage of the Property. (*Id.* at ¶¶ 104-113.) Only one of the ZBA members, however, recused himself from the hearing. (*Id.* at ¶¶ 106, 109.) The ZBA eventually denied Firetree's appeal by a vote of 4-1. (*Id.* at ¶ 115.)

The ZBA held subsequently "a public hearing on Firetree's Special Exception Application on the evenings of June 28, July 13, and July 27, 2017." (*Id.* at ¶ 117.) This hearing, like the previous one, "was marred by procedural irregularities, discrimination, political pressure, and neighborhood opposition based on stereotypes about persons with disabilities." (*Id.* at ¶ 117.) The Chairman of the ZBA, who had previously criticized Firetree in an interview

with a local newspaper, refused to recuse himself from the matter. (*Id.* at ¶ 119.) Firetree made a number of arguments at the hearing, including the request for a reasonable accommodation under the FHA and the ADA. (*Id.* at ¶¶ 123-26.) As these hearings were ongoing, Firetree commenced the instant suit on June 30, 2017, "alleging that the ZEO's actions in denying the tenant occupancy permit and certificate of zoning compliance and the ZBA's actions in denying the Appeal violated Firetree's rights under the FHA, the ADA, the United States Constitution, and state law . . . ." (*Id.* at ¶ 127.) "Although the ZBA had continued the public hearing from July 13 to July 27 for two reasons only, on July 26, 2017 the ZBA invited City Director of Human Relations and Fair Rent Department Adam Bovilsky to address the ZBA regarding Firetree's request for a reasonable accommodation under the ADA." (*Id.* at ¶ 135.) "On July 27, 2017, Mr. Bovilsky submitted a letter to the ZBA" noting that although "he had not reviewed the entire record, based on the documents that he had read it did not appear that Firetree provided enough information as to Firetree's request for a reasonable accommodation, and that Firetree's request could not be analyzed without more." (*Id.* at ¶ 136.) The ZBA "closed the public hearing on July 27" and subsequently denied Firetree's Special Exception Application on a 4-1 vote. (*Id.* at ¶ 137.)

## III. Legal Standard

### A. Rule 12(b)(1)

"Dismissal of a case for lack of subject matter jurisdiction under Rule 12(b)(1) is proper 'when the district court lacks the statutory or constitutional power to adjudicate it.'" *Ford v. D.C. 37 Union Local 1549*, 579 F.3d 187, 188 (2d Cir. 2009), quoting *Makarova v. United States*, 301 F.3d 110, 113 (2d Cir. 2000). In determining whether subject matter jurisdiction exists, "the court must take all facts alleged in the complaint as true and draw all reasonable

inferences in favor of the plaintiff." *Natural Resources Defense Council v. Johnson*, 461 F.3d 164, 171 (2d Cir. 2006). A district court may also "refer to evidence beyond the pleadings" in determining whether subject matter jurisdiction exists. *Makarova*, 201 F.3d at 113. "The plaintiff bears the burden of proving subject matter jurisdiction by a preponderance of the evidence." *Aurecchione v. Schoolman Tranp. Sys, Inc.*, 426 F.3d 635, 638 (2d Cir. 2005).

### B. Rule 12(b)(6)

Under Fed. R. Civ. P. 12(b)(6), the Court must determine whether plaintiffs have alleged "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ray v. Watnick*, 688 F. App'x 41 (2d Cir. 2017) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citations and internal quotation marks omitted)). While the Court must "draw all reasonable inferences in favor of the non-moving party," *Vietnam Ass'n for Victims of Agent Orange v. Dow Chem. Co.*, 517 F.3d 104, 115 (2d Cir. 2008), it must grant the moving party's motion if "a complaint is based solely on wholly conclusory allegations and provides no factual support for such claims. . . ." *Scott v. Town of Monroe*, 306 F. Supp. 2d 191, 198 (D. Conn. 2004).

## IV. Discussion

### A. Subject Matter Jurisdiction

The defendants advance several arguments in support of the contention that the Court lacks subject matter jurisdiction in this case. I address each in turn.

### 1.     Ripeness

The defendants argue that all of Firetree's claims, save the eighth and ninth counts of its Complaint, fail on ripeness grounds.  "Ripeness is a doctrine rooted both in Article III's case or controversy requirement and prudential limitations on the exercise of judicial authority." *Murphy v. New Milford Zoning Comm'n*, 402 F.3d 342, 347 (2d Cir. 2005).  "At its heart is whether [the Court] would benefit from deferring initial review until the claims [it is] called on to consider have arisen in a more concrete and final form."  *Id.*  In adjudicating ripeness claims, courts must "consider (1) the fitness of the issues for judicial decision and (2) the hardship to the parties of withholding court consideration."  *Authors Guild, Inc. v. HathiTrust*, 755 F.3d 87, 104 (2d Cir. 2014) (internal quotation marks omitted).  The Second Circuit, relying upon the Supreme Court's decision in *Williamson Cty. Reg'l Planning Comm'n v. Hamilton Bank of Johnson City*, 473 U.S. 172, 175 (1985), has set out a specific standard for ripeness in the context of land use disputes.  *See Murphy*, 402 F.3d at 347.  This standard requires a plaintiff challenging a zoning restriction "to obtain[] a final, definitive position from the entity charged with implementing the zoning regulations" before bringing suit.  *Murphy*, 402 F.3d at 342.  But a property owner is not required to litigate a dispute before a "purely remedial body" to make it ripe.  *See id.* at 350 ("[A] property owner will not be required to litigate a dispute before a zoning board of appeals if it sits as a purely remedial body.").  A "remedial" body is one that is "empowered, at most, to review [a zoning entity's] rejection, not to participate in the [entity's] decisionmaking."  *Williamson*, 473 U.S. at 193. The defendants contend that Firetree failed to meet this requirement.  (ECF No. 48 at 13.)  I disagree.

As noted above, Firetree appealed the denial of its tenant occupancy permit, C.O., and Special Exception Application to the ZBA.  Each of its appeals was denied.  The next step for

Firetree would have been an appeal to Connecticut Superior Court. *See* Conn. Gen. Stat. § 8-8(b) ("[A]ny person aggrieved by any decision of a board, including a decision to approve or deny a site plan . . . or a special permit or special exception . . . may take an appeal to the superior court for the judicial district in which the municipality is located . . . ."). Such a proceeding would be purely remedial, however, given that the Superior Court would have the power to review the ZBA's decision only to the extent necessary to "determine whether it was unreasonable, arbitrary or illegal." *See Irwin v. Planning & Zoning Comm'n of Town of Litchfield*, 244 Conn. 619, 628 (1998); *see also Wiltzius v. Town of New Milford*, 453 F. Supp. 2d 421, 431 (D. Conn. 2006) ("Connecticut law is clear that administrative appeals to the Superior Court are purely remedial and, thus, not required before an agency decision is final."); *Port Clinton Assocs. v. Bd. of Selectmen of Town of Clinton*, 217 Conn. 588, 607 (1991) (concluding that plaintiff bringing action under 42 U.S.C. § 1983 was not obligated to pursue administrative appeal to superior court under Conn. Gen. Stat. § 8-8 from adverse decision before commencing suit). Firetree's claim is therefore ripe for adjudication.

Defendants cite *Ferris v. Town of Guilford*, No. 3:10-CV-2014 CSH, 2015 WL 128029 (D. Conn. Jan. 8, 2015) in support of a contrary conclusion. (*See* ECF No. 48 at 16.) *Ferris* concerned a real estate developer's appeal of a local zoning board's refusal to approve a proposed development in the absence of certain conditions. *Id.* at *1-3. The plaintiff in *Ferris* had initially filed an appeal to the Connecticut Superior Court but withdrew it in favor of a suit in federal district court claiming that the zoning board's decision violated his constitutional rights— in particular, he argued that the decision violated his "constitutional rights to equal protection of the laws and due process." *Id.* at *4. The *Ferris* court concluded that the plaintiff's claim was unripe for two reasons. *Id.* at *7. First, it emphasized the fact that the plaintiff had previously

filed suit in Connecticut Superior Court on the same grounds and then withdrawn that suit for "inadequate and unpersuasive" reasons. *Id.* at *5. Second, the court concluded that the plaintiff was effectively bootstrapping a challenge to the rationality of the zoning board's decision into a constitutional claim. *See id.* at *7 ("But [the plaintiff] does not have a right to parlay his refusal to pursue an 'available state law remedy' in the state court into an entitlement to bring a federal suit in this Court, alleging constitutional violations.").

Neither of these rationales is applicable to the present case. Firetree did not file suit in Connecticut Superior Court before filing the instant claim. *See Beard v. Town of Monroe*, No. 3:13CV1714 (JBA), 2015 WL 8023632, at *6 (D. Conn. Dec. 4, 2015) (distinguishing *Ferris* on basis that plaintiff had not filed and then withdrawn claim in state superior court challenging zoning board's decision). Further, its constitutional and federal statutory claims do not provide a mere façade for a frontal challenge to the rationality of the ZBA's decision akin to the *Ferris* plaintiff's constitutional claims. Rather, Firetree alleges that the ZBA's decision was motivated by discriminatory animus. To the extent that the rationale of *Ferris* cannot be distinguished from the present case, however, I decline to follow it.[2] The majority of courts in this district to

_____

[2] I note that *Ferris* makes no mention of the Connecticut Supreme Court's decision in *Port Clinton Associates*, 217 Conn. 588, which rests, in part, on an interpretation of state law and is, to that extent, binding on this Court. Specifically, in addressing the finality requirement of *Williamson* (a matter of federal law), the Connecticut Supreme Court considered the same Connecticut zoning appeal statute on which the defendants rely here, Conn. Gen. Stat. § 8-8, holding that that statute "provides for an administrative appeal to the *Superior Court*, which may review the propriety of the initial decisionmaker's action within the usual limits on judicial review of an agency action." *Port Clinton Associates*, 217 Conn. at 607. The Court thus concluded that "[t]he statutory appeals process under § 8-8 is . . . precisely the type of procedure that a claimant under 42 U.S.C. § 1983 need not pursue as a prerequisite to filing his suit." *Id.* at 607. In light of this, this Court is bound to construe § 8-8—as a matter of state law—as "empower[ing] the Connecticut Superior Court,] at most, to review that rejection, not to participate in the [ZBA's] decisionmaking." *Williamson County*, 473 U.S. at 193. The defendant's reference in their reply brief to minor linguistic changes to § 8-8 in 2015 does not change this outcome.

consider the issue have held that an appeal of a zoning decision to the superior court under Conn. Gen. Stat. § 8-8 constitutes a "remedial" proceeding. *See Wiltzius*, 453 F. at 431; *Lawson v. E. Hampton Planning & Zoning Comm'n*, No. 3:07CV1270 AHN, 2008 WL 4371297, at *7 (D. Conn. Sept. 22, 2008) (noting that appeal of adverse land-use decision to superior court "was purely remedial"); *Beard*, 2015 WL 7023632 at *6 (concluding that plaintiff's land-use claim was ripe despite her failure to attain a final judgment from superior court before filing suit). Further, the Second Circuit noted in *Murphy* that "a zoning board of appeals will typically be the venue from which a final, definitive decision will emanate." *Murphy*, 402 F.3d at 353. Thus, I am not persuaded the case must be dismissed on ripeness grounds.

### 2.    Firetree's Conn. Gen. Stat. § 8-8 Appeals

The defendants contend that Firetree's eighth and ninth counts—both of which advance appeals under Conn. Gen. Stat. § 8-8—fail on jurisdictional grounds. (ECF No. 48 at 19.) The defendants advance two arguments in support of this contention: (1) that these state law claims are the only ones not subject to dismissal on ripeness grounds and thus merit dismissal; and (2) that these administrative appeals are not properly before this court. (*See id.*) The former argument founders given that Firetree's other claims are not subject to dismissal on ripeness grounds. The second argument fares little better. Conn. Gen. Stat. § 8-8(b) provides that "any person aggrieved by any decision of a board . . . may take an appeal to the superior court for the judicial district in which the municipality is located." The defendants contend that this language forecloses an appeal to a federal district court. (ECF No. 48 at 20.) But a state statute cannot divest a federal court of jurisdiction. *See Grand Bahama Petroleum Co. v. Asiatic Petroleum Corp.*, 550 F.2d 1320, 1325 (2d Cir. 1977) ("In determining its own jurisdiction, a District Court of the United States must look to the sources of its power and not the acts of states which have

no power to enlarge or to contract the federal jurisdiction." (internal quotation marks omitted)).

Thus, the language of Conn. Gen. Stat. § 8-8(b) does not divest the Court of jurisdiction over

Firetree's claims. Here, the Court's jurisdiction over Firetree's claims under § 8-8(b) rests upon

supplemental jurisdiction.[3] *See* 28 U.S.C. § 1367(a) ("[I]n any civil action of which the district

courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all

other claims that are so related to claims in the action within such original jurisdiction that they

form part of the same case or controversy under Article III of the United States Constitution.").

The case of *Elgard Corp. v. Brennan Const. Co.*, 157 F.R.D. 1 (D. Conn. 1994) is

instructive on this point. In *Elgard*, the defendants contended that a plaintiff's suit under a state

statute had to be dismissed because the statute in question provided that "[e]very suit instituted

under this section shall be brought . . . in the superior court for the judicial district where the

contract was to be performed . . . ." *Id.* at 2 (internal quotation marks omitted). This language,

the defendants contended, "mandate[d] that [the plaintiff's suit] be brought only in state Superior

Court in the judicial district where the project is situated." *Id.* The *Elgard* court rejected this

claim, noting that "[w]hile a state statute may mandate that a bond suit be filed only in a

particular state court, . . . a state statute cannot divest a federal District Court of diversity

jurisdiction." *Id.* (internal quotation marks and citations omitted). The same principle applies to

suits predicated upon supplemental jurisdiction. *See U.S. ex rel. Galmines v. Novartis Pharm.

Corp.*, No. CIV.A. 06-3213, 2013 WL 5924962, at *5-6 (E.D. Pa. Nov. 5, 2013) ("[S]tate

statu[t]es cannot restrict federal court jurisdiction by specifying state venue as opposed to by

declaring jurisdiction exclusive in certain of its courts . . . . It is of no matter that these state law

---

[3] It is worth noting that the plaintiff also invokes diversity jurisdiction, although it does not specify the citizenship of the defendants. (*See* Complaint at ¶ 14.)

14

claims fall under the Court's supplemental jurisdiction as opposed to its diversity jurisdiction—they fall under federal jurisdiction . . . all the same . . . ." (internal citations omitted)). Thus, the Court possesses jurisdiction over Firetree's appeals under Conn. Gen. Stat. § 8-8(b).

### 3. Joinder of Administrative Appeals

The defendants contend that Firetree cannot advance its appeals of the ZBA's decision under Conn. Gen. Stat. § 8-8(b) and its other claims in the same action. (ECF No. 48 at 22.) The defendants reason that the limited right of appeal under § 8-8(b)—i.e., the limited record, deferential standard of review, and requirement of adjudication by a judge—renders such claims ill-suited for joinder with open-ended federal claims. (*Id.* at 22-23.) There is some Connecticut case law that supports this point. *See, e.g.*, *Dan Beard, Inc. v. Orange Town Plan & Zoning Comm'n*, No. CV92 03 87 50S, 1992 WL 175075, at *3 (Conn. Super. Ct. July 16, 1992) ("It is clear that an adjudication of the plaintiff's § 1983 claim and an award of the monetary relief requested pursuant to that claim are outside both the court's scope of review and its authority to grant relief in an appeal from decisions of a planning and zoning commission brought pursuant to [Conn. Gen. Stat. § 8-8].")). On the other hand, other Connecticut courts have considered a plaintiff's constitutional claims along with its administrative appeals. *See, e.g.*, *Cambodian Buddhist Soc'y of CT., Inc. v. Newtown Planning & Zoning Comm'n*, No. CV030350572S, 2005 WL 3370834, at *3 (Conn. Super. Ct. Nov. 18, 2005) (considering plaintiff's constitutional claims along with its appeal under Conn. Gen. Stat. § 8-8).

Here, I conclude that forcing Firetree to seek review of its appeals under § 8-8(b) in a separate action would be unnecessary and contrary to the interests of judicial economy. None of the defendants' arguments merit forcing Firetree to seek relief elsewhere after litigating this case for nearly two years. First, the defendants' objections regarding the standard of review are

irrelevant given the nature of Firetree's claims.  Firetree's constitutional and statutory claims are not reliant upon the supposition that the ZBA's claims were merely wrong.  Rather, they aver that the ZBA's decision was motivated by discriminatory animus.  The Court can apply a deferential standard of review in analyzing the ZBA's decision—as Connecticut law requires— while reviewing Firetree's other claims de novo under applicable law.

Second, the defendants' concerns about the lack of available discovery lack merit given that Conn. Gen. Stat. § 8-8(k) permits a reviewing court to allow parties to supplement the record.  *See* Conn. Gen. Stat. § 8-8(k) ("The court shall review the proceedings of the board and shall allow any party to introduce evidence in addition to the contents of the record if . . . it appears to the court that additional testimony is necessary for the equitable disposition of the appeal.").  Indeed, the *Cambodian Buddhist Soc'y* court did just that in order to review a plaintiff's federal claims along with its zoning appeal under § 8-8(b).  *See Cambodian Buddhist Soc'y*, 2005 WL 3370834, at *3 (noting that the court allowed the plaintiff to present evidence outside of the record under Conn. Gen. Stat. § 8-8(k) in order to facilitate review of its federal claims along with its zoning appeal).  Finally, while the defendants are correct that Firetree's administrative appeals must be heard by the court as opposed to a jury, *see* Conn. Gen. Stat. § 8-8(i) ("The court, after a hearing thereon, may reverse or affirm, wholly or partly, or may revise, modify or remand the decision from which the appeal was taken in a manner consistent with the evidence in the record before it."), nothing would prevent the court from hearing those claims separately should either side file a jury demand.  *See* Fed. R. Civ. P. 42(b).  As it stands, no such demand has been filed.

For these reasons, I conclude that the Court possesses subject matter jurisdiction over all of the plaintiff's claims.

**B.  Rule 12(b)(6)**

**1.  FHA and CFHA Claims**

The FHA prohibits "discriminat[ion] in the sale or rental, or to otherwise make unavailable or deny, a dwelling to any buyer or renter because of a handicap of . . . a person residing in or intending to reside in that dwelling after it is so sold, rented, or made available . . . ."  42 U.S.C. § 3604(f)(1).  Claims under the FHA and the CFHA are adjudicated under similar same standards.  *See AvalonBay Communities, Inc. v. Town of Orange*, 256 Conn. 557, 591 (2001) ("[I]n addressing claims brought under both federal and state housing laws, we are guided by the cases interpreting federal fair housing laws . . . despite differences between the state and federal statutes." (internal citations and quotation marks omitted)).

The defendants assert that Firetree's housing claims fail because the residents of the proposed halfway house are prison inmates and such inmates have no right to the housing of their choice.  (*See* ECF No. 48 at 24-25.)  This misses the point.  Firetree is not arguing that the defendants wrongfully denied it the ability to use the Property as a halfway house because of a discriminatory animus against prisoners.  It is contending that the defendants discriminated against it because the residents of its halfway house *are disabled*.  (*See* Complaint at ¶ 160 ("Defendants' actions described herein were significantly motivated by the disabled status of Firetree's residents, and constitute intentional discrimination in violation of the [FHA].").)  To the extent that the defendants argue that they actually denied Firetree's requested zoning relief because of its intent to house prisoners, such an argument depends on adopting factual

contentions contrary to the allegations in the complaint and thus cannot be vetted in the context of a motion to dismiss. Thus, the defendant's argument on this point is inapposite.[4]

The defendants also contend that Firetree's FHA claims must be dismissed because "the purpose of the FHA was not intended to apply to prisoners or correctional institutions as in the present circumstances, but to apply in the context of the sale or rental of a dwelling." (ECF No. 48 at 25.) In support of this contention, the defendants cite a single case from the District of Columbia. (*See id.* (citing *Abdus-Sabur v. Hope Vill., Inc.*, 221 F. Supp. 3d 3, 14 (D.D.C. 2016))). *Abdus-Sabur* concerned, in relevant part, a prisoner's claim under the FHA against the operator of a halfway house for failing to provide him with a handicap accessible shower. *See*

---

[4] It is also worth noting that most of the cases the defendants cite address claims brought by prisoners against the BOP based upon housing determinations made by the BOP or other governmental authorities charged with housing prisoners. (*See* ECF No. 48 at 24-25 (citing, *e.g.*, *McGaughy v. Johnson*, 63 F. App'x 177, 178 (6th Cir. 2003) (rejecting prisoner's challenge to placement in administrative segregation at prison); *Vargas v. Pataki*, 899 F. Supp. 96, 98 (N.D.N.Y. 1995) (rejecting prisoner's challenge to amendment to New York State law governing work release program making homicide offenders ineligible); *Levine v. Apker*, 455 F.3d 71, 83 (2d Cir. 2006) (rejecting prisoner's challenge to BOP regulation limiting BOP's ability to place prisoners in halfway houses); *Fournier v. Zickefoose*, 620 F. Supp. 2d 313, 314 (D. Conn. 2009) (rejecting prisoner's challenge to BOP decision declining to place her in a halfway house for the remainder of her term of imprisonment); *Wong v. Ponce*, No. 2:16-CV-00501 AC P, 2017 WL 784913, at *2 (E.D. Cal. Mar. 1, 2017) ("To the extent that petitioner claims a constitutional right to be housed in a particular place, such as an RRC, that claim is without merit.")). None of these cases speak to the plaintiff's claim, however, which concerns whether an outside entity may discriminate against individuals—who also happen to be inmates—because of their disabilities *after* their designation to a particular residence by the BOP.

The only potentially relevant case the defendants cite in support of this argument is *Garcia v. Condarco*, 114 F. Supp. 2d 1158 (D.N.M. 2000*)*, a New Mexico district court decision noting that "the primary purpose of the FHA has no application in the prison context." *Id.* at 1162. *Garcia*, however, concerned a detainee's sex discrimination claim under the FHA based upon the plaintiff's being sexually assaulted at a jail. *Id.* at *1159. Further, the only argument at issue in that case was whether the jail constituted a "dwelling" under the FHA—an argument defendants do not make with respect to the halfway house in this case. *Id.* at *1159. Thus, this case is inapposite.

*id.* at 6-7. The basis of the *Abdus-Sabur* court's decision was that the "statutory language [of the FHA] . . . limit[s] the scope of unlawful discrimination to the entity buying or renting the dwelling in question." *Id.* at *15 (internal quotation marks omitted). Even if that decision were binding on me, however, it would not apply here. Firetree, undisputedly the buyer of the dwelling, has alleged that the defendants have discriminated against it because its residents are disabled, a claim expressly contemplated by the FHA. 42 U.S.C. § 3604(f)(1) (making it unlawful "[t]o discriminate in the sale or rental, or to otherwise make unavailable or deny, a dwelling to any buyer or renter because of a handicap of (A) that buyer or renter, (B) a person residing in or intending to reside in that dwelling . . . or (C) any person associated with that buyer or renter"). Further, Firetree has standing to assert such a claim. *See Tsombanidis v. W. Haven Fire Dep't*, 352 F.3d 565, 574 (2d Cir. 2003) (concluding owner of halfway house for recovering alcoholics and drug addicts had standing to advance handicap discrimination claim under FHA in response to adverse zoning decision).

I therefore reject the defendants' motion to dismiss Firetree's fair housing claims.

### 2. ADA and Rehabilitation Act Claims

Title II of the ADA states that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. In a similar vein, Section 504 of the Rehabilitation Act provides that "[n]o otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a). The defendants assert that Firetree's ADA and Rehabilitation Act claims fail

for several reasons: (1) inmates do not have a right to the housing of their choice under the ADA; (2) the defendants denied Firetree's requests for zoning relief because of the future residents' status as prisoners, not their disabilities; and (3) there can be no intentional discrimination given that the zoning regulations at issue specifically prohibit prisoner halfway houses. (*Id.* at 27-29.) The first and second arguments fail for the reasons discussed in the previous section.

The third argument does not move the dial for the defendants either. The defendants contend that they could not have possibly intentionally discriminated against Firetree, because they were merely faithfully applying the zoning regulations at issue. (ECF No. 48 at 28-29 (citing building Zone Regulation § 118-350 (B)(2)(h) (providing that "a halfway house for persons under the jurisdiction of the Department of Corrections shall not be permitted").) As an initial matter, Firetree's proposed halfway house would not appear to have run afoul of this regulation on its face given that it would have housed persons under the jurisdiction of the BOP, not the Connecticut Department of Corrections. Second, even if this regulation could be construed to prohibit Firetree's halfway house, the complaint pleads facts that, when construed in Firetree's favor, suggest that the ZBA applied the provision in a discriminatory manner. Thus, the defendants' contention that it was merely faithfully implementing the zoning regulations is not a basis to dismiss these claims.[5]

### 3. Equal Protection and Retaliation Claims

The defendants advance separate attacks upon the equal protection and retaliation components of Firetree's fifth and tenth counts. I address these arguments in turn.

---

[5] The defendants also contend that Firetree's Rehabilitation Act claim fails because, under that statute, "the purported discrimination must be solely based upon the protected disability." (ECF No. 48 at 29.) As noted above, Firetree makes such an allegation. Thus, this argument fails.

### a)  Retaliation Claim

To set out a First Amendment retaliation claim, a plaintiff "must prove: (1) he has an interest protected by the First Amendment; (2) defendants' actions were motivated or substantially caused by his exercise of that right; and (3) defendants' actions effectively chilled the exercise of his First Amendment right." *Curley v. Vill. of Suffern*, 268 F.3d 65, 73 (2d Cir. 2001). The defendants contend that Firetree has failed to meet the third element of this standard, because it continued litigating its case after the ZBA's denial of its application for a Special Exception Permit. (ECF No. 48 at 44.) This argument misconstrues the requirements for a retaliation claim. The "chilling effect" component of a First Amendment retaliation claim need not relate directly to speech; any harm independent of First Amendment chilling will do. *See Gill v. Pidlypchak*, 389 F.3d 379, 383-84 (2d Cir. 2004) ("[D]efendants are correct that a plaintiff asserting First Amendment retaliation must allege some sort of harm, but they are wrong that this harm must, in all cases, be a chilling of speech . . . . Under this approach, standing is no issue whenever the plaintiff has clearly alleged a concrete harm independent of First Amendment chilling."). Firetree alleges that its commencement of the lawsuit against the ZBA and the ZEO on June 30, 2017 resulted in the ZBA's denying Firetree's Special Exception Application in retaliation against Firetree. (*See* Complaint at ¶¶ 207-09.) This harm is significant enough to grant Firetree standing to pursue a First Amendment retaliation claim. *See Gagliardi v. Village of Pawling*, 18 F.3d 188, 194-95 (2d Cir. 1994) (reversing dismissal of First amendment retaliation claim based on zoning decisions made after plaintiffs expressed opposition).

### b)  Equal Protection Claim

A plaintiff may set out an equal protection claim by averring that, "(1) compared with others similarly situated, plaintiff was selectively treated; and (2) that such selective treatment

was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person." *Washpon v. Parr*, 561 F. Supp. 2d 394, 409 (S.D.N.Y. 2008) (quoting *Freedom Holdings, Inc. v. Spitzer*, 357 F.3d 205, 234 (2d Cir. 2004) (quoting *Lisa's Party City, Inc. v. Town of Henrietta*, 185 F.3d 12, 16 (2d Cir. 2004))).  He or she may also allege a "class of one" claim, "where the plaintiff alleges that [he or she] has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000).  "In order to succeed on a 'class of one' claim, the level of similarity between plaintiffs and the persons with whom they compare themselves must be extremely high." *Neilson v. D'Angelis*, 409 F.3d 100, 104 (2d Cir. 2005), *overruled on other grounds by Appel v. Spiridon*, 531 F.3d 138 (2d Cir. 2008).

The defendants contend that Firetree's equal protection claims in its fifth and tenth counts fail because it cannot establish a "class of one claim"—in particular, they aver that Firetree's comparison of itself to Pivot Ministries is inapposite.  (ECF No. 48 at 31.)  The defendants contend that the following differences between Firetree and Pivot Industries undermine the comparison: (1) Pivot Ministries did not operate a residential reentry center on the Property; (2) Pivot Ministries did not operate a correctional institution on the Property; (3) Pivot Industries did not house prisoners serving a prison sentence; (4) Pivot Ministries never applied for a zoning permit to operate a residential reentry center (or halfway house); (5) Pivot Ministries was never granted a C.O. to operate a residential reentry center (or halfway house) in a Class C Residence Zone.  (*Id.* at 31-32.)  The former three grounds appear to miss relevant portions of Firetree's complaint.  As noted above, Firetree alleges that Pivot Ministries "obtained zoning permits to use the Property as a halfway house" and that "[m]ost of Pivot Ministries' residents resided at the

Property as an alternative to being incarcerated, had been recently released from prison, or had regular contact with the criminal justice system, including probation, parole, or supervised release." (Complaint at ¶¶ 36-37.) Given that I am required to draw all inferences in Firetree's favor, I conclude that its allegation that Pivot Ministries housed residents "recently released from prison" and "as an alternative to being incarcerated" and operated a "halfway house" could be interpreted as housing persons serving a transitional portion of a prison sentence. Further, the defendants' contentions that Pivot Ministries never applied for or obtained zoning permits to operate the Property as a halfway house is of no consequence given the allegation that it was permitted to operate as such for years without incident. (*See id.* at ¶¶ 41-44.) Thus, Firetree alleges that Pivot Ministries was permitted to use the Property as a halfway house without incident, while Firetree was not. Since Firetree has adequately alleged an "extremely high" level of similarities between its intended use of the Property and Pivot Ministries' previous use of the Property, I deny the defendants' motion to dismiss Firetree's equal protection claims.

### 4. Substantive and Procedural Due Process Claims

To set out a "procedural due process violation, [a plaintiff] must: (1) identify a property right, (2) establish that governmental action with respect to that property right amounted to a deprivation, and (3) demonstrate that the deprivation occurred without due process." *Rosa R. v. Connelly*, 889 F.2d 435, 438 (2d Cir. 1989). To set out a substantive due process claim, a plaintiff must similarly "establish that he had a valid property interest in a benefit that was entitled to constitutional protection at the time he was deprived of that benefit." *Zahra v. Town of Southold*, 48 F.3d 674, 680 (2d Cir. 1995) (internal quotation marks and emphasis omitted). The Second Circuit "uses a strict entitlement test to determine whether a party's interest in land-use regulation is protectable under the fourteenth Amendment." *Id.* (internal quotation marks

omitted).  This "analysis focuses on the extent to which the deciding authority may exercise *discretion* in arriving at a decision, rather than on an estimate of the probability that the authority will make a specific decision."  *Id.*  The defendants contend that Firetree's substantive and procedural due process claims fail because they do not meet this requirement.  (ECF No. 48 at 33.)

This argument flies in the face of the allegations in the Complaint.  As noted above, Firetree alleges that Pivot Ministries used the Property in the exact same way that Firetree intended to use it.  (*See* Complaint at ¶¶ 36-37.)  Under Connecticut law, zoning regulations may not prohibit the continuance of a prior nonconforming use.  *See* Conn. Gen. Stat. § 8-2(a) ("[Town zoning] regulations shall not prohibit the continuance of any nonconforming use, building or structure existing at the time of the adoption of such regulations or require a special permit or special exception for any such continuance.").  A prior nonconforming use constitutes a vested property right under both substantive and procedural due process.  *See Gavlak v. Town of Somers*, 267 F. Supp. 2d 214, 221 (D. Conn. 2003) ("[T]he plaintiffs have alleged the existence of a nonconforming use, which, if established, is a vested property right in Connecticut and its legality in the first instance does not require a variance . . . ."); *Brady v. Town of Colchester*, 863 F.2d 205, 212 (2d Cir. 1988) (concluding district court erred in granting summary judgment on plaintiffs' substantive and procedural due process claims on basis that they lacked cognizable Fourteenth Amendment property rights to certificate of occupancy where plaintiffs had shown genuine dispute of material fact concerning whether prior use of property was identical to plaintiffs' proposed use of property).

I therefore reject the defendants' motion to dismiss Firetree's substantive and procedural due process claims.[6]

### 5. Takings Claim

The Connecticut Constitution provides that "[t]he property of no person shall be taken for public use, without just compensation therefor." Conn. Const. art. I, § 11. "An inverse condemnation claim[7] accrues when the purpose of government regulation and its economic effect on the property owner render the regulation substantially equivalent to an eminent domain proceeding." *Rural Water Co. v. Zoning Bd. of Appeals of Town of Ridgefield*, 287 Conn. 282, 298 (2008) (internal quotation marks omitted). "[A]n inverse condemnation occurs when either: (1) application of the regulation amounted to a practical confiscation because the property cannot be used for any reasonable purpose; or (2) under a balancing test, the regulation's application impermissibly has infringed upon the owner's reasonable investment-backed expectations of use and enjoyment of the property so as to constitute a taking." *Id.* Under the balancing test, a "regulation does not constitute a compensable taking if it does not infringe on . . . [the] reasonable investment-backed expectations [of the owner]." *Id.* (internal quotation marks omitted). Courts analyzing takings claims under Connecticut law must "consider[] the facts of each case with consideration being given not only to the degree of diminution in the value of the land but also to the nature and degree of public harm to be prevented and to the alternatives available to the landowner." *Jackson Hill Rd. Sharon CT, LLC v. Town of Sharon*, No. 3:07-CV-

---

[6] The defendants moved to dismiss Firetree's mandamus claim on the basis that Firetree's procedural and substantive due process claims failed. Given my disposition with respect to the latter claims, I deny the defendants' motion to dismiss the mandamus claim.

[7] Although Firetree does not specify what type of takings claim it advances in its Complaint, it notes that it advances an inverse condemnation claim in its objection to the defendants' motion for summary judgment. (ECF No. 53 at 45.)

1445 (WWE), 2010 WL 2596927, at *4 (D. Conn. June 24, 2010) (internal citation marks omitted). In other words, the "court must weigh the financial effects on the owner with the health, safety and welfare of the community." *Id.*

The defendants argue that Firetree's takings claim fails because it does not allege that the Property cannot be "utilized for any reasonable and proper purpose" if it cannot be used as a halfway house. (ECF No. 48 at 35.) I disagree. Although the standard for takings claims under Connecticut law is demanding, Firetree sets out a viable claim that its reasonable investment-backed expectations were infringed by the defendants' actions. In particular, as noted above, Firetree contends that it purchased the property for $429,000 in reliance on the ZEO's issuance of the Zoning Permit and the Building Department's issuance of the building permit. (Complaint at ¶ 247.) Further, it contends that it spent $630,000 to renovate the Property specifically to make it suitable as a halfway house. (*Id.*) When this claim is coupled with Firetree's allegations that its use of the Property "would actually increase safety in the area as compared to when Pivot Ministries had operated its halfway house" (*id.* at ¶ 93), the balancing test above weighs in Firetree's favor.

The defendants contend that Firetree misrepresented its intended use of the Property and therefore cannot advance any valid reliance interests. (ECF No. 59 at 10.) This argument, however, would require me to disregard Firetree's allegations in its complaint. I cannot take such an action in adjudicating a motion to dismiss. The defendants also allege that Firetree has not established that the Property could not be used for "any purpose other than for housing inmates serving out their prison sentence." (ECF No. 48 at 35.) But such a showing was not required. Rather, Firetree merely had to satisfy the balancing test set out above weighing the diminution of the property's value against the potential harms to the local community addressed

by the regulation at issue.  Firetree alleged that it purchased and renovated the property at significant expense based upon the defendants' misrepresentations and that the building is "uniquely suited for use as a halfway house."  (Complaint at ¶ 247.)  As noted above, it also contended that its use of the Property would make the local community safer.  Such allegations "nudge [Firetree's takings] claim[] across the line from conceivable to plausible" under the balancing test for inverse condemnation claims.  *In re Fosamax Products Liab. Litig.*, 2010 WL 1654156, at *1.

**V.     Conclusion**

For these reasons, the defendants' motion to dismiss (ECF No. 48) is denied.

IT IS SO ORDERED.

_____/s/_____
Michael P. Shea, U.S.D.J.

Dated:          Hartford, Connecticut
                September 14, 2018